IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:23-cr-182-RAH-SMD |
| | ) | |
| STEVEN TODD ROSEBORO | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the Court is Defendant Steven Todd Roseboro's ("Roseboro") Motion to Challenge Jury Venire (Doc. 49), along with his Renewed Motion to Challenge Jury Venire (Doc. 82). Roseboro argues that the Middle District of Alabama's ("Middle District") jury selection process violated the fair-cross section requirement of the Sixth Amendment and the Jury Selection and Service Act ("JSSA") of 1968, 28 U.S.C. § 1861, *et seq.*, by underrepresenting Black or African American people in the jury venire. As explained below, the motions should be denied.

**I.     FACTUAL & PROCEDURAL BACKGROUND[1]**

Roseboro is an African American male, Mot. (Doc. 49) p. 1, who was indicted by a federal grand jury for (1) possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and (2) commission of an offense while on release and under supervision, in violation of 18 U.S.C. § 3147, Indictment (Doc. 1). His trial was set for August 21, 2023. Order (Doc. 17).

---

[1] The numerical and statistical data contained in this section was provided by Roseboro's expert statistician. *See generally* Ren. Mot. (Doc. 82) pp. 1-3. The undersigned assumes for purposes of this Recommendation that Roseboro's information is accurate.

On August 17, 2023, Roseboro received notice of the availability of juror questionnaires for his upcoming trial. Ren. Mot. (Doc. 82) p. 1. After reviewing the questionnaires, Roseboro was concerned that the jury selection process and the composition of the venire significantly underrepresented African American people generally, as well as Black males specifically. *Id*. at 2. He thus filed a motion objecting to the composition of the jury venire, but the Court deferred ruling on the motion until after trial. Mot. (Doc. 49); *see* Order (Doc. 50).

The Court proceeded with jury selection. Ren. Mot. (Doc. 82) p. 3. Of the 91 potential jurors for Roseboro's trial, 78 were Caucasian (86%); 11 were African American (12%); 1 was Hispanic (1%); and 1 was Native American (1%). *Id*.

In the Middle District, 32.89% of the jury-eligible population[2] is Black or African American. Expert Affid. (Doc. 82-1) p. 2. For the Middle District's qualified jury wheel,[3] 28.21% are Black or African American. *Id*. at 3. In the Southern Division[4] of the Middle District, 21.28% of the jury-eligible population is Black or African American. *Id*. at 2. For the Southern Division's qualified jury wheel, 16.95% are Black or African American. *Id*.

---

[2] The jury eligible population is defined as the population that is age 18 years and older who are citizens of the United States. Expert Affid. (Doc. 82-1) p. 2.

[3] The qualified jury wheel is comprised of individuals randomly selected for the master jury wheel, who then returned questionnaires that were reviewed by the Clerk. Middle District's Jury Plan, *Sealed* (Doc. 83-1) p. 5. Based on the questionnaires, "all persons found to be disqualified, exempted or excused from service as jurors" are excluded from the qualified jury wheel. *Id*.

[4] The Middle District of Alabama is comprised of three divisions: Northern, Middle, and Southern. *See* https://www.almd.uscourts.gov/about/alabama-middle-district. The Southern Division, which is at issue here, is comprised of Coffee, Dale, Geneva, Henry, and Houston counties. *Id*.

at 3.

Roseboro's jury returned a guilty verdict. Jury Verdict (Doc. 55); Special Jury Verdict (Doc. 56). The District Judge then referred Roseboro's motion challenging the jury venire to the undersigned Chief United States Magistrate Judge. Order (Doc. 50). After Roseboro obtained necessary discovery, he renewed his motion, and the Government filed its opposition. Ren. Mot. (Doc. 82); Resp. (Doc. 88). Roseboro's motions are now ripe for recommendation.

## II. ROSEBORO'S JURY CHALLENGE

Roseboro argues that the Middle District's jury selection process violated the fair cross-section requirement of the Sixth Amendment and the JSSA by underrepresenting Black or African American people on the qualified jury wheel.[5] Ren. Mot. (Doc. 82) p. 5. Roseboro also argues that certain aspects of the jury selection process employed by the Middle District violates "the plain text and meaning" of the JSSA, as well as its "spirit and purpose." *Id*. at 18, 20. Based on these arguments, Roseboro asks that his conviction be vacated and that his case be reset for trial. *Id*. at 20.

## III. APPLICABLE LAW

"The American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). This concept is protected constitutionally by the Sixth Amendment and statutorily by the JSSA. *Id*.

---

[5] Although Roseboro originally raised concerns about the underrepresentation of Black males specifically, *see* Mot. (Doc. 49) p. 4, he now focuses on the alleged underrepresentation of Black or African American people generally, *see* Ren. Mot. (Doc. 82) p. 5.

To establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979). The JSSA's fair cross-section requirement is, for all intents and purposes, "identical to that required by the Sixth Amendment." *United States v. Carmichael*, 560 F.3d 1270, 1278 (11th Cir. 2009) (citing *United States v. Rodriguez*, 776 F.2d 1509, 1510 n.1 (11th Cir. 1985)). Thus, to establish a fair cross-section violation under the Sixth Amendment or the JSSA, a defendant must satisfy all three prongs of the *Duren* test. *United States v. Carmichael*, 467 F. Supp. 2d 1282, 1306 (M.D. Ala. 2006). Failure on any element ends the challenge. *Id*.

## IV. FAIR CROSS-SECTION ANALYSIS

Roseboro's fair cross-section challenge under both the Sixth Amendment and the JSSA fails because he does not satisfy the second or third prongs of the *Duren* test.

### A. First Prong: Distinctive Group in the Community

Roseboro satisfies the first prong of the *Duren* test because it is well-established that Black and African American people constitute a "distinctive group in the community." *See, e.g., Carmichael*, 560 F.3d at 1280.

**B. Second Prong: Fair and Reasonable Representation**

Roseboro fails to satisfy the second prong of the *Duren* test because he has not shown "that the representation of [Black or African American people] in venires from which [his jury was] selected is not fair and reasonable in relation to the number of [Black or African American people] in the community[.]" *See Duren*, 439 U.S. at 364. In this context, the relevant comparison is "between the percentage of [Black or African American people] in the population eligible for jury service and the percentage of [Black or African American people] in the pool." *Carmichael*, 560 F.3d at 1280. "Under black letter Eleventh Circuit precedent, '[i]f the absolute disparity between these two percentages is ten percent or less, [*Duren*'s] second element is not satisfied[.]" *Id.* (quoting *United States v. Grisham*, 63 F.3d 1074, 1078-79 (11th Cir. 1995)); *see also United States v. Dees*, 603 F. App'x 777, 780 (11th Cir. 2015); *United States v. Davis*, 854 F.3d 1276, 1295 (11th Cir. 2017); *United States v. Fernetus*, 838 F. App'x 426, 434-35 (11th Cir. 2020). Absolute disparity is calculated "by subtracting the percentage of [Black or African American people] in the jury pool from the percentage of [Black or African American people] in the local, jury-eligible population." *Berghuis v. Smith*, 559 U.S. 314, 323 (2010).

According to Roseboro's own numbers, the percentage of Black or African American people in the Southern Division's qualified jury wheel (16.95%) subtracted from the percentage of Black or African American people in the Southern Division's jury-eligible population (21.28%) is 4.33%. Ren. Mot. (Doc. 82) p. 8. Because this absolute disparity is less than ten percent, Roseboro fails—under clearly established Eleventh

5

Circuit precedent—to satisfy the second prong of *Duren*.[6] *See Dees*, 603 F. App'x at 780 ("To determine whether jury representation is fair and reasonable, we will only look to the 'absolute disparity produced by the selection process,' which, in such cases, means there must be more than a ten percentage point disparity between the percentage of the group in the population and the percent of the group in the jury pool."). As such, Roseboro's fair cross-section challenge fails under both the Sixth Amendment and the JSSA.

To be sure, Roseboro petitions the Court to reject the Eleventh Circuit's ten percent absolute disparity rule as applied to the second prong of *Duren*. *See* Mot. (Doc. 82) pp. 7-12; 16-18. However, this Court is bound by Eleventh Circuit precedent to apply the ten percent absolute disparity rule unless the rule is either overruled by the United States Supreme Court or the Eleventh Circuit sitting en banc. *United States v. Pritt*, 458 F. App'x 795, 798 (11th Cir. 2012). Because neither has occurred, this Court should apply the ten percent absolute disparity rule to Roseboro's fair cross-section challenge and find that he fails to meet *Duren*'s second prong. *See Repress v. United States*, 713 F. App'x 826, 828 (11th Cir. 2017) (per curiam) (affirming a district court that applied binding circuit precedent despite danger of overruling by an intervening Supreme Court precedent).

### C. Third Prong: Systematic Exclusion

Even if Roseboro could satisfy the second prong of *Duren* by application of a

---

[6] In the Eleventh Circuit, the community to which the venire should be compared is the division, not the district. *See Grisham*, 63 F.3d at 1079-80; *Dees*, 603 F. App'x at 780. However, even if the Court were to calculate the absolute disparity based on the percentage of Black or African American people in the district, the disparity—according to Roseboro's numbers—is 4.68%. Ren. Mot. (Doc. 82) pp. 8-9. Thus, under either comparison, Roseboro does not satisfy the second prong of *Duren*.

6

method other than the Eleventh Circuit's ten percent absolute disparity rule, his fair cross-section challenge still fails because he does not meet the third prong of *Duren*—i.e., he has not shown that the underrepresentation of Black or African American people "is due to systematic exclusion . . . in the jury-selection process." *See Duren*, 439 U.S. at 364. In determining whether an action is systematic, a court may consider a variety of factors, including whether the cause is within the jury-selection system or the result of an outside factor.[7] *See Carmichael*, 467 F. Supp. 2d at 1312-13. Importantly, "systematic exclusion does not occur simply because a facially neutral disqualification criterion disproportionately impacts a particular group." *United States v. Barlow*, 732 F. Supp. 2d 1, 40 (E.D.N.Y. 2010), aff'd, 479 F. App'x 372 (2d Cir. 2012). Moreover, a defendant cannot show systematic exclusion "merely by pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332.

Here, Roseboro argues that the underrepresentation of Black or African American individuals in the Middle District's jury selection process stems from three systematic problems: (1) the exclusion of inactive registered voters; (2) the exclusion of young jurors aged 18-20.5; and (3) inadequate follow-up procedures related to sending out juror qualification questionnaires. Ren. Mot. (Doc. 82) p. 12. But as explained below, these

---

[7] Other factors to consider include: (1) the frequency over which the action occurs, (2) whether the action is an adopted policy or rule, (3) whether the action is taken by a decision-maker or is known, or should be known, by a decision-maker, (4) whether the action is intentional, and (5) the breadth and pervasiveness of the action's impact. *Carmichael*, 467 F. Supp. 2d at 1312-13.

purported problems—alone or in combination—do not result in systematic exclusion of Black or African American people from the jury pool. Thus, Roseboro does not satisfy *Duren*'s third prong, and his fair cross-section challenge fails.

### 1. Exclusion of Inactive Registered Voters

The JSSA provides that, in establishing a jury plan, each district court shall "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district." 28 U.S.C. § 1863(b)(2). "Voter registration lists" is defined to mean "the official records maintained by State or local election officials of persons registered to vote in either the most recent State or the most recent Federal general election." 28 U.S.C. § 1869(c).

The Middle District's Jury Plan establishes a procedure which draws jurors only from *active* voter lists. Middle District's Jury Plan ("Jury Plan"), *Sealed* (Doc. 83-1) p. 2. By its terms, then, this procedure excludes *inactive* voters, which are defined by Alabama law to be voters who fail to vote for four years in their county. ALA. CODE § 17-4-9. Roseboro claims that inactive voters—who are still registered voters and therefore viable candidates for jury service under the plain terms of the JSSA—are disproportionately Black or African American. Ren. Mot. (Doc. 82) pp. 12-13. Thus, he argues that "the systematic exclusion of inactive voters has resulted in the underrepresentation of [B]lack individuals in the jury selection process." *Id*. at 13.

The evidence before the Court shows that 33.40% of active voters in the Middle District are Black or African American, while 36.66% of inactive voters are Black or

African American. Expert Affid. (Doc. 82-1) p. 10. Similarly, for the Southern Division, 21.08% of active voters are Black or African American, while 24.71% of inactive voters are Black or African American. *Id*. Roseboro does not provide evidence showing the extent to which these particular discrepancies affect the percentage of Black or African American people in the master or qualified wheels.

Theoretically, Roseboro's data could show that Black or African American people are underrepresented in the jury pool because the Middle District excludes inactive jurors from potential service.[8] However, even if this policy negatively impacts the presence of Black or African American people in the jury selection process, the policy is facially neutral, and Roseboro has not shown that anything inherent in the process itself causes the purported underrepresentation. Instead, any underrepresentation is attributable to the private choices of individuals—i.e., the decision to not vote for four years and therefore be removed from the active voter list—and is not due to systematic exclusion.[9]

---

[8] *See United States v. Lawrence*, 553 F. Supp. 3d 131, 144 (S.D.N.Y. 2021) (noting that the defendant's expert calculated that the exclusion of inactive voters from potential jurors resulted in a 0.18% underrepresentation of Black people in the master wheel).

[9] *See United States v. Pritt*, 2010 WL 2342440, at *6 (M.D. Fla. June 8, 2010) (finding that the clerk's policy of failing to supplement voter registration lists because the lists allegedly underrepresented minorities did not show systematic exclusion because any underrepresentation was fueled by the private choices of individuals), aff'd *Pritt*, 458 F. App'x at 799; *United States v. Orange*, 447 F.3d 792, 799-800 (10th Cir. 2006) (finding that the clerk's policy of drawing potential jurors from voter registration lists, which purportedly underrepresented minorities because they were less likely to register to vote than their majority counterparts, was not systematic exclusion); *United States v. Scott*, 545 F. Supp. 3d 152, 167 (S.D.N.Y. 2021) (noting that inactive voter exclusion is facially neutral and that no court has found the policy to violate the Sixth Amendment).

### 2. Exclusion of Young Jurors

The Middle District's Jury Plan provides that the master jury wheel is "emptied and refilled at least every four years[.]" Jury Plan, *Sealed* (Doc. 83-1) p. 10. The master jury wheel used to select Roseboro's jurors was filled on February 18, 2021, making the wheel thirty months old at the time the jurors were summoned. Ren. Mot. (Doc. 82) p. 13. As a result, the youngest possible juror at that time was 20 years and 6 months old. *Id*.

Roseboro's evidence shows that, in the Middle District, 36.19% of the 18- and 19-year-old population is Black or African American, while 32.25% of the 18 and over population is Black or African American. Exp. Affid. (Doc. 82-1) p. 11. Similarly, in the Southern Division, 19.84% of the 18- and 19-year-old population is Black or African American, while 20.98% of the 18 and over population is Black or African American. *Id*. Thus, because Black or African American people make up a larger percentage of young people when compared to the population as a whole, Roseboro argues that their underrepresentation in the jury selection process "is partially attributable to the systematic exclusion of young voters[.]" Ren. Mot. (Doc. 82) p. 13. He does not provide evidence showing the extent to which this exclusion contributes to underrepresentation of Black or African American people in the master or qualified wheels.

Theoretically, Roseboro's data could show that Black or African American people are underrepresented in the jury pool because the Middle District refills the master jury

10

wheel every four years and thus excludes younger people from potential jury service.[10] However, even if this refilling policy negatively impacts the presence of Black or African American people in the jury selection process, the policy has been repeatedly found to be facially neutral. *See, e.g.*, *Lawrence*, 553 F. Supp. 3d at 144 (finding that the policy of refilling the master wheel at four-year intervals was facially neutral); *United States v. Scott*, 545 F. Supp. 3d 152, 167 (S.D.N.Y. 2021) (same). Roseboro has not shown that anything inherent in the jury selection process itself causes the purported underrepresentation. As such, Roseboro has failed to show that the policy is the result of systematic exclusion.

### 3. Inadequate Follow-Up Procedures for Juror Questionnaires

The Middle District's Jury Plan provides that the Clerk "shall mail juror qualification questionnaires to the persons whose names appear on the Master Jury Wheel[.]" Jury Plan, *Sealed* (Doc. 83-1) p. 3. Based on the responses to the qualification questionnaire, the names of the persons found qualified to serve are then transferred to a qualified jury wheel. *Id*. at 5. The Jury Plan does not require the Clerk to send a follow-up questionnaire if a response is not received or if the questionnaire is returned by the U.S. Postal Service.

Roseboro presents data tracking the number of Black or African American people throughout each step of the jury selection process. Ren. Mot. (Doc. 82) pp. 13-14. At the

---

[10] *See*, *Lawrence*, 553 F. Supp. 3d at 144 (noting that the defendant's expert concluded that refilling the master wheel at four-year intervals results in a 0.32% underrepresentation of Black people on the master wheel).

11

beginning of the process, 21.28% of the jury eligible population was Black or African American. *Id*. at 14. By the end, the qualified jury wheel population was 16.95% Black or African American. *Id*. According to Roseboro, the two largest factors contributing to this decrease are (1) the rate at which responses are received by the Clerk (attributing to a 4.14% loss), and (2) the deliverability of qualification questionnaires (attributing to a 0.99% loss). *Id*. Based on this data, Roseboro speculates that "something inherent in the process of mailing out, and receiving back, juror qualification questionnaires is resulting in the disproportionate exclusion of [B]lack individuals." *Id*. at 14. He attributes this alleged exclusion to the lack of provisions in place "to send a follow-up questionnaire" if a response is not received or returned, or "to distinguish qualification questionnaires that are intentionally ignored from qualification questionnaires that were never received, either due to incomplete address information or unreliability inherent in the delivery of first class mail." *Id*.

The Clerk's actions or inactions regarding questionnaire follow-ups are facially neutral. Further, any underrepresentation is attributable to the private choices of individuals—i.e., the decision to not update an address, the failure to respond promptly or at all to a mailing, etc.—and not anything inherent in the jury selection process. As such, Roseboro has failed to show that these purported failures are due to systematic exclusion. *See Orange*, 447 F.3d at 799-800 (finding that alleged procedural defects in the jury selection process—including the clerk's failure to update addresses, locate undeliverable questionnaires, or take follow-up action regarding questionnaires—did not constitute

12

systematic exclusion and were instead the result of private choices of individuals).

### 4. Conclusion

In sum, Roseboro has not shown that any underrepresentation of Black or African American people throughout the jury selection process is the result of systematic exclusion. As such, he fails to satisfy the third prong of *Duren* and his fair cross-section challenge fails.

## V.    OTHER VIOLATIONS OF THE JSSA

The JSSA statutorily protects a defendant's "right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. When the jury-selection process violates the JSSA, a defendant may obtain relief. However, to do so, he must show that the jury-selection process resulted in a "substantial failure to comply" with the JSSA's provisions, meaning that the JSSA violation must have "a significant impact on the composition of an average jury." *United States v. Henderson*, 409 F.3d 1293, 1306 (11th Cir. 2005) (quoting *United States v. Tuttle*, 729 F.2d 1325, 1328 (11th Cir. 1984)); *see also Carmichael*, 560 F.3d at 1277 ("By its terms, the JSSA provides remedies only for a 'substantial failure to comply' with its requirements.") (quoting 28 U.S.C. § 1867(d)).

"A JSSA violation is considered 'substantial' when it frustrates one of the three principles underlying the Act: (1) random selection of juror names; (2) from a fair cross-section of the community; and (3) use of objective criteria for determination of disqualifications, excuses, exemptions, and exclusions." *Carmichael*, 560 F.3d at 1277

(citing *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984)). Mere technical deviations that do not implicate the JSSA's randomness or objectivity principles or otherwise lead to impermissible discrimination in the jury selection process are not substantial violations and do not warrant relief. *See United States v. Clay*, 159 F. Supp. 2d 1357, 1365 (M.D. Ala. 2001) ("When the JSSA's goals of random selection of juror names or the use of objective criteria for determination of disqualifications, excuses, exemptions, or exclusions are frustrated, the court may find that a substantial violation of the act has taken place."); *see also United States v. Bearden*, 659 F.2d 590, 609 (5th Cir. Unit B 1981)[11] ("Where the procedural errors made by those in charge of selecting juries do not raise the possibility of frustrating [the JSSA's] goal[s], a court should be hesitant to order the drastic remedy of the dismissal of indictments.").

Roseboro presents three technical challenges to the Middle District's jury selection process. First, Roseboro argues that the selection process impermissibly excludes inactive voters from prospective juror lists. Ren. Mot. (Doc. 82) p. 19. Second, Roseboro argues that the AO-12 form[12] used by the Middle District to track demographic information incorrectly tracks data from the district as a whole instead of each division individually. *Id*. Third, Roseboro contends that the census numbers provided in the AO-12 form are from

---

[11] *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

[12] The AO-12 form is issued by the Administrative Office of the United States Courts and is designed to assist district courts in "determining whether their jury wheels comply with the randomness and non discrimination provisions of the [JSSA]" and in "comparing a statistical sampling of jury wheels against general population data." AO-12 Form, *Sealed* (Doc. 83-2) p. 3.

14

the year 2015, which is five years prior to the creation of the master jury wheel and eight years before the date the potential trial jurors were summoned. *Id*. at 19-20. The undersigned addresses each alleged violation in turn.

### A. Whether the selection process impermissibly excludes inactive voters from prospective juror lists.

As previously discussed in this Recommendation, the JSSA provides that, in establishing a jury plan, each district court shall "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district." 28 U.S.C. § 1863(b)(2). "Voter registration lists" is defined to mean "the official records maintained by State or local election officials of persons registered to vote in either the most recent State or the most recent Federal general election." 28 U.S.C.§ 1869(c).

Roseboro argues that the Middle District's Jury Plan, which provides that jurors shall be selected at random from the *active* voter registration lists of the counties within the Middle District, "excludes from the jury selection process approximately 55,586 individuals on the *inactive* voter list." Ren. Mot. (Doc. 82) p. 18. Roseboro contends that this "violates the plain text and meaning" of the JSSA because the source of potential jurors is neither all registered voters nor actual voters. *Id*. at 18; Expert Affid. (Doc. 82-1) p. 1. Roseboro asserts that this policy ultimately results "in the underrepresentation of [B]lack individuals in the jury selection process." Ren. Mot. (Doc. 82) p. 13.

Even if the Middle District's policy of selecting potential jurors from active voter

15

lists does not comply with the JSSA's plain language, the policy does not constitute a substantial violation of the JSSA. Simply put, Roseboro has not shown that the policy frustrates the randomness or objectivity principles of the JSSA, or that it otherwise leads to impermissible discrimination in the jury selection process. *See Carmichael*, 560 F.3d at 1278 (finding that a JSSA violation was not substantial where "'[t]here is no evidence that, by itself, [the policy] caused juries to consist of something other than a fair cross-section of the community, or that it provided opportunity to discriminate against any cognizable group or any individuals in the selection process'") (quoting *Clay*, 159 F. Supp. 2d at 1368)). As such, the undersigned finds that the alleged violation is not substantial, and no relief is warranted.

## B.     Whether the AO-12 form tracks the wrong demographic information.

Roseboro points out that the Middle District's AO-12 form "only reports demographic information on the entire Middle District of Alabama *as a whole*." Ren. Mot. (Doc. 82) p. 19. He contends that this reporting is contrary to the Jury Plan, which directs that prospective jurors be drawn from each division individually and not the Middle District as a whole. *Id*. Roseboro argues that by failing to track information from each individual division, "the [AO-12] form—and the information collection process as a whole—is not functioning as intended as a tool for determining the representativeness of juries in the Middle District." *Id*. Thus, he concludes that "the AO-12 form, in its current state, does not advance its intended goal of ensuring that 'all litigants in Federal courts' have been afforded their 'right to grand and petit juries selected at random from a fair cross section

16

of the community in the district or division wherein the court convenes.'" *Id*. (quoting 28 U.S.C. § 1861).

By its nature, the reporting of information pertaining to the jury selection process is facially neutral and does not affect the underlying process itself. Roseboro fails to otherwise show how the Middle District's reporting of district-wide information instead of division-specific information on the AO-12 form frustrates the randomness or objectivity principles of the JSSA, or how such reporting leads to impermissible discrimination in the jury selection process itself. As such, the alleged violation is not substantial, and no relief is warranted.

### C.  Whether the census numbers in the AO-12 form are outdated.

Roseboro states that "the census numbers provided in the AO-12 form are from the year 2015—five years before the creation of the master jury wheel and eight years before the date the potential trial jurors were summoned." Ren. Mot. (Doc. 82) pp. 19-20. Although Roseboro fails to make a specific argument as to how this allegedly violates the JSSA, *see id*., the undersigned presumes he is challenging the freshness of the census data used to create the master wheel.

Roseboro fails to show that the reporting and/or use of 2015 census data frustrates the randomness or objectivity principles of the JSSA, or that it otherwise leads to impermissible discrimination in the jury selection process. As such, the alleged violation is not substantial, and no relief is warranted.

## VI.  CONCLUSION

For the reasons explained above, it is the

RECOMMENDATION of the undersigned Chief United States Magistrate Judge that Roseboro's Motion to Challenge Jury Venire (Doc. 49) and his Renewed Motion to Challenge Jury Venire (Doc. 82) be DENIED. It is further

ORDERED that the parties shall file any objections to this Recommendation **on or before August 27, 2024**.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1.  *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 13th day of August, 2024.

_/s/ Stephen M. Doyle_

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE